USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/15/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE L'ORÉAL USA BENZOYL PEROXIDE PRODUCTS LITIGATION

24 Civ. 2735 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Defendant, L'Oreal USA, Inc ("L'Oreal"), is a major manufacturer, distributor, advertiser, and marketer of cosmetic goods. *See* Second Amended Class Complaint ("SACC") ¶ 20, ECF No. 62. At issue are three L'Oreal benzoyl peroxide ("BPO") acne treatment products: CeraVe Acne Foam Cream Cleanser (4% BPO), CeraVe Acne Foaming Cream Wash (10% BPO), and La Roche-Posay Effaclar Duo Dual Acne Treatment (5.5% BPO) (collectively, the "BPO Products"). *See id.* Plaintiffs, Ciara Noakes, Latifah Abednego, Lucinda O'Dea, Holly Grossenbacher, Ellen Painter, Robert Hightower, Jennifer Snow, Marilyn Silva, Simone Westerfield, Moussa Kouyate, and Kayla Mraz, who hail from Hawaii to New York, purchased at least one of the BPO Products between 2020 and 2024. *See id.* ¶¶ 8–18. Subsequently, Plaintiffs learned that the BPO Products allegedly contained benzene—a known carcinogen that has been linked to leukemia and other blood cancers. *See id.* ¶ 63. Plaintiffs, aggrieved by the purported presence of dangerous levels of benzene in their BPO Products, sued L'Oreal in courts around the country. Six actions were transferred to this Court and were consolidated, along with an existing pending case, into this putative class action. *See* Consolidation Order, ECF No. 40.

Plaintiffs' SACC alleges four state law causes of actions: (1) deceptive business practices in violation of state deceptive trade practices laws; (2) breach of the implied warranty of merchantability;[1] (3) negligent misrepresentation/omission; (4) and unjust enrichment. *See* SACC ¶¶ 124–92. These causes of action are predicated on Plaintiffs' contention that the presence of benzene renders the BPO Products "adulterated and misbranded." *Id.* ¶ 6. Defendant filed a motion to dismiss pursuant to Federal Rule of Civil Procedure Rule 12(b)(6), arguing chiefly that Plaintiffs' state law claims were preempted by federal law. *See* Mot., ECF No. 66; Mem., ECF No. 67; *see also* Opp., ECF No. 71, Reply, ECF No. 72.[2] For the reasons stated below, the Court finds that Plaintiffs' claims are preempted and GRANTS Defendant's motion to dismiss with prejudice.

## BACKGROUND

### I. Factual Background[3]

Defendant manufactures and sells the BPO Products. SACC ¶ 24. Plaintiffs allege that "[a]ll of [the] BPO Products are manufactured in the same manner[, and] [a]ll lots of Defendant's BPO Products contain . . . or systematically degrade to form benzene," which is "a carcinogen that has been linked to leukemia and other blood cancers." *Id.* ¶¶ 1, 26–27. Specifically, BPO can degrade into benzene at high temperatures, and Plaintiffs' core theory is that "it was the [Defendant's] manufacturing and holding of the [BPO] Products at unacceptable temperatures that cause[d] the benzene contamination and/or . . . instability." *Id.* ¶ 94.

---

[1] This claim is brought solely on behalf of "the California, Louisiana, Missouri, Hawaii, and New Jersey Subclasses." SACC at 53. All other claims are brought on behalf of the proposed "[n]ationwide [c]lass and the California, Alabama, Illinois, Louisiana, Missouri, Florida, Hawaii, New Jersey and New York [s]ubclasses." *Id.* at 49, 55, 58.

[2] The Court has reviewed Defendant's five exhibits in support of its motion to dismiss, *see* ECF No. 68, as well as the seven exhibits listed as part of Plaintiffs' opposition brief. *See* Fraietta Decl. ECF No. 71-1. Neither party contends that the Court may not consider these documents.

[3] The facts are taken from the Plaintiffs' SACC. The Court assumes that all facts alleged in the SACC are true. S*ee* *Galper v. JP Morgan Chase Bank*, 802 F.3d 437, 443–44 (2d Cir. 2015).

Plaintiffs are residents of nine different states who purchased one or more of Defendant's BPO Products from various retail suppliers between 2020 to 2024. *Id.* ¶¶ 8–18. At the time of purchase, Plaintiffs "reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the [Defendant] that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded." *Id*. Notably, "benzene [was] not listed on the BPO Products' labels as an ingredient or inactive ingredient, nor [was] there any warning about the presence (or even potential presence) of benzene in the BPO Products." *Id.* ¶ 129.

On March 5, 2024, Valisure, "an industry leader in independent chemical testing of medications," submitted a public citizens petition to the United States Food and Drug Administration ("FDA") "requesting a recall and suspension of sales of [BPO] products from the U.S. market," among other proposed actions. *Id.* ¶¶ 63–64; *see also* Valisure Citizen Petition at 4, ECF No. 68-1. "Valisure analyzed 66 different BPO containing drug products," and "every one of the 66 products contained some level of benzene." SACC ¶ 68. Valisure tested samples of two of the three brands of the BPO Products at this issue this action. *See* Mem. at 3.

The FDA responded the following month, stating that it had thus far "been unable to reach a decision on [the] petition because it raises complex issues requiring extensive review and analysis by [FDA] officials." FDA Valisure Response at 2, ECF No. 68-2. On March 11, 2025, just over a year after the Valisure petition was filed, the FDA released a notice (the "March 2025 Notice") alerting the public that it had "initiated independent testing following receipt of third-party testing results submitted to the agency that raised concerns about elevated levels of benzene in certain acne products containing [BPO]." FDA March 2025 Notice at 1, ECF No. 68-3. The FDA noted that although its "testing results indicate fewer products with benzene

contamination than the third-party findings," it had "concluded that a limited number of products should be recalled at the retail level." *Id*. The March 2025 Notice further explained that a "retail level" recall "means retailers are instructed to remove products from store shelves and online marketplaces but does not specifically instruct consumers to take actions regarding products currently in their possession [because] [e]ven with daily use of these products for decades, the risk of a person developing cancer because of exposure to benzene found in these products is very low." *Id*. Defendant is listed on the notice as agreeing to voluntarily recall a single lot of La Roche-Posay Effaclar Duo Dual Acne Treatment (lot # MYX46W). *See id*.; *see also* SACC ¶ 71. No Plaintiffs allege that they purchased a product from that specific lot. *See* Mem. at 4.

In addition to Valisure's findings, a number of Plaintiffs "subjected the [BPO Products they purchased] to testing by an independent laboratory[,] which found the [BPO Products] contained benzene at levels that create the likely potential for life-threatening issues or permanent impairment of a body function . . . ." SACC ¶¶ 15–16, 18 (internal quotations omitted). Plaintiffs maintain that "if Defendant had disclosed to Plaintiffs and putative [c]lass members that the BPO Products contain benzene and/or would degrade to form benzene, Plaintiffs and putative [c]lass members would not have purchased the BPO Products at all, or would have paid significantly less for them." *Id.* ¶ 82. Plaintiffs claim that as a result they suffered "economic injury" for which they seek redress.[4] *Id.* ¶ 19.

---

[4] The Court notes that after Valisure submitted its petition, other individuals who had purchased different brands of acne drugs that contained BPO filed similar suits against manufacturers of those drugs. *See e.g.*, *Williams v. Galderma Lab'ys, L.P.*, No. 24 Civ. 2222, 2024 WL 4213220 (N.D. Ill. Sept. 17, 2024); *O'Dea v. RB Health (US) LLC*, 779 F. Supp. 3d 1135 (C.D. Cal. 2025); *In re Target Corp. BPO Sales & Mktg. Litig.*, No. 24 Civ. 1323, 2026 WL 145824 (D. Minn. Jan. 20, 2026); *Mitchell v. Kenvue, Inc.*, No. 24 Civ. 4109, 2026 WL 509400 (D.N.J. Feb. 24, 2026); *Howard v. Alchemee, LLC*, No. 24 Civ. 01834, 2024 WL 4272931 (C.D. Cal. Sept. 19, 2024); *Smoter v. Mentholatum Co., Inc.*, No. 24 Civ. 4155, 2025 WL 273437 (N.D. Ill. Jan. 17, 2025); *Bodunde v. Walgreens Boots All., Inc.*, No. 24 Civ. 00985, 2025 WL 1411306 (E.D. Cal. May 15, 2025), *report and recommendation adopted*, 2025 WL 3628487 (E.D. Cal. Dec. 15, 2025); *Kouyate v. L. Perrigo Co.*, No. 25 Civ. 1013, 2026 WL 591874 (W.D. Mich. Mar. 3, 2026); *Kouyate v. Harvard Drug Grp. LLC*, No. 24 Civ. 6223, 2025 WL 2773159 (S.D.N.Y. Sept. 26, 2025); *Daugherty v. Padagis US LLC*, 794 F. Supp. 3d 674 (N.D. Cal. 2025); *Navarro v. Walmart, Inc.*, 24 Civ.

II. Procedural Background

On May 28, 2025, the Court consolidated the seven related cases before it. *See* Consolidation Order. Plaintiffs then amended their complaint, ECF No. 52, which was met with Defendant's motion to dismiss. ECF No. 56. In response, Plaintiffs filed their SACC and Defendant filed a new motion to dismiss. *See* SACC; Mot. After Plaintiffs filed their opposition papers and Defendant filed its reply, both parties filed notices of supplemental authority, which the Court has considered. *See* ECF Nos. 75–79.

**LEGAL STANDARD**

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide "detailed factual allegations" in the complaint but must assert "more than labels and conclusions." *Twombly*, 550 U.S. at 555. Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* The court must accept the allegations in the complaint as true and draw all reasonable inferences in the non-movant's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

In addition to the SACC itself, the Court may consider documents attached to the SACC or incorporated in it by reference, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon in bringing the suit. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).

---

288, 2025 WL 3563471 (E.D. Cal. Dec. 12, 2025), *report and recommendation adopted*, 2026 WL 266374 (E.D. Cal. Feb. 2, 2026); *Barnes v. Unilever United States Inc.*, No. 21 Civ. 6191, 2023 WL 2456385 (N.D. Ill. Mar. 11, 2023).

**ANALYSIS**

Plaintiffs' state law claims are predicated on their allegations that (1) Defendant misbranded the BPO Products by not warning Plaintiffs of the presence of benzene, and (2) the presence of benzene in the BPO Products renders them adulterated and, therefore, impermissibly sold.

Defendant argues that Plaintiffs' state law claims are preempted by the federal Food Drug and Cosmetic Act ("FDCA"), which governs the manufacturing, marketing, and labeling of over the counter ("OTC") drugs such as the BPO Products. *See* Mem. at 1; 21 U.S.C. § 301 *et seq*. The "preemption doctrine flows from the Constitution's Supremacy Clause, U.S. Const., Art. VI, cl. 2, which 'invalidates state laws that interfere with, or are contrary to, federal law,'" *Tufariello v. Long Island R. Co.*, 458 F.3d 80, 86 (2d Cir. 2006) (quoting *Sprint Spectrum L.P. v. Mills,* 283 F.3d 404, 414–15 (2d Cir. 2002)). "Federal regulations, like federal statutes, can also preempt state law if validly promulgated and falling within the scope of the agency's congressionally delegated authority." *Yousefzadeh v. Johnson & Johnson Consumer Inc.*, 184 F.4th 130, 145 (2d Cir. 2026). Plaintiffs contend their state law claims are not preempted because they "in no way conflict, interfere with, or impose obligations that are materially different than those imposed by federal law." SACC ¶ 2.

The Court first examines the regulatory scheme that governs the BPO Products as well as the relevant FDCA preemption provisions. The Court then considers the federal requirements Defendant was obligated to follow in both the labeling and production of the BPO Products and whether Defendant complied with such requirements.

I. <u>Federal Regulatory Scheme</u>

Congress passed the FDCA "in 1938 as part of a comprehensive federal regulatory scheme to protect consumers from fraud or misrepresentation in the sale of food, drugs, and cosmetics." *Critcher v. L'Oreal USA, Inc.*, No. 18 Civ. 5639, 2019 WL 3066394, at *2 (S.D.N.Y. July 11, 2019) (citation omitted), *aff'd,* 959 F.3d 31 (2d Cir. 2020). Congress' goal was "to create a national and uniform regulatory scheme, . . . which up until the FDCA's passage, had been subject to the disparate laws of the states." *Patora v. Vi-Jon, LLC*, No. 22 Civ. 6678, 2023 WL 5610300, at *3 (S.D.N.Y. Aug. 30, 2023) (citation omitted). To that end, the FDA has been given the "authority to promulgate regulations for the efficient enforcement" of the FDCA. 21 U.S.C. § 371(a); *see also id.* § 393. Each of the BPO Products, as both parties acknowledge, are categorized under the FDCA as OTC drugs. *See* SACC ¶ 52; Mem. at 2. "[T]he FDA allows manufacturers of OTC drugs to sell products without FDA review so long as the manufacturer adheres to the relevant monograph." *Williams*, 2024 WL 4213220, at *3 (citing 21 C.F.R. § 330.10). "A monograph is a 'recipe'; a 'detailed regulation . . . for each therapeutic class of OTC drug products' that 'sets out the FDA-approved active ingredients for a given therapeutic class of OTC drugs and provides the conditions under which each active ingredient is' generally recognized as safe and effective by the FDA." *Id.* (quoting *NRDC v. FDA*, 710 F.3d 71, 75 (2d Cir. 2013)). In addition to designating approved active ingredients, an FDA monograph also lays out an OTC drug's labeling requirements. *See Yousefzadeh*, 184 F.4th at 140.

The FDA's monograph for OTC topical acne drug products (the "Acne Monograph") "provides that a topical OTC drug 'is generally recognized as safe and effective and is not misbranded if it meets' (1) 'each of the conditions' that apply only to topical acne drug products

and (2) 'each general condition' applicable to all OTC drugs." *Kouyate*, 2025 WL 2773159, at *7 (quoting 21 C.F.R. § 333.301). One of the important "general condition[s]" is that manufacturers of OTC drugs must follow the current Good Manufacturing Practice for Finished Pharmaceuticals ("cGMPs"), which are standards enforced by the FDA "designed to insure [sic] the production of unadulterated drugs." *Nutritional Health All. v. Food & Drug Admin.*, 318 F.3d 92, 100 (2d Cir. 2003) (quoting *United States v. An Article of Drug*, 484 F.2d 748, 751 (7th Cir. 1973)); *see also* 21 C.F.R. § 211 *et seq*.

In sum, if the manufacturer of an OTC topical acne drug adheres to the Acne Monograph and each of the general conditions required for all OTC drugs, including the relevant cGMPs, it has complied with the necessary federal manufacturing and labeling regulations—which, in turns, means the product is "generally recognized by the FDA as safe and effective" and "not misbranded."

II. <u>Preemption Under the FDCA</u>

In line with its intent to create a "national and uniform regulatory scheme," *Patora*, 2023 WL 5610300, at *3, the FDCA contains multiple relevant preemption provisions.

A. Misbranding Claims

The FDCA's has an explicit preemption provision covering the labeling or packaging of "cosmetic" drugs, which includes OTC skin creams, and reads as follows:

> [N]o State or political subdivision of a State may establish or continue in effect any requirement for labeling or packaging of a cosmetic that is different from or in addition to, or that is otherwise not identical with, a requirement specifically applicable to a particular cosmetic or class of cosmetics under this chapter. . . .

21 U.S.C. § 379s(a); *see Critcher v. L'Oreal USA, Inc.*, 959 F.3d 31, 35 (2d Cir. 2020) (explaining that "cosmetic" drugs include OTC skin creams).

The Second Circuit has interpreted this provision to "preempt[] not only those state laws that are in conflict with it (*i.e.*, any law that is 'different from' the FDCA), but also *any* state law that provides for labeling requirements that are not *exactly the same* as those set forth in the FDCA and its regulations (*i.e.*, any law that is 'in addition to' the FDCA)." *Critcher*, 959 F.3d at 35–36 (emphasis in original). Therefore, the Court's job is to "determine if any of the state-law claims [Plaintiffs] assert[]—whether based in statute or common law—imposes a labeling requirement that is 'different from' or 'in addition to' those provided by the FDCA." *Id*. at 36. In other words, so long as Defendant complied with the FDCA's labeling requirements, any state law relied on by Plaintiffs that would have required Defendant to add information "in addition to" or "different from" those federal requirements is preempted.

B. Adulteration Claims

The FDCA also contains a general preemption provision that states "no State or political subdivision of a State may establish or continue in effect any requirement (1) that relates to the regulation of a drug . . . and (2) that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter." 21 U.S.C. § 379r(a). This applies to Plaintiffs' claims of adulteration under state law. To the extent that Plaintiffs allege that the BPO Products were adulterated under state law, despite compliance with federal regulation, those claims are "expressly preempted because [they] impose[] a requirement that is in addition to and not identical to the FDCA." *Kouyate*, 2025 WL 2773159, at *16.

III. Federal Regulatory Requirements for the BPO Products

The Court now examines whether federal regulations required Defendant to warn Plaintiffs of the potential presence of benzene on the BPO Products' labels. The Court then

considers whether the presence of benzene in the BPO Products renders them "adulterated" in violation of the FDCA.

A. BPO Products Misbranding Claim

One of the two foundations for Plaintiffs' state law claims is misbranding, namely, that "benzene is not listed on the BPO Products' labels as an ingredient or inactive ingredient, nor is there any warning about the presence (or even potential presence) of benzene in the BPO Products." SACC ¶ 129. Defendant concedes that its BPO Products do not contain any mention of benzene but argues that the Acne Monograph "does not require any warnings or labeling requirements regarding benzene or associated cancer risks." Mem. at 2. The Court has examined the Acne Monograph and concludes that Defendant is correct. *See* Acne Monograph, 21 C.F.R. § 333.301 (Scope), § 333.303 (Definitions), § 333.310 (Acne active ingredients), § 333.320 (Permitted combinations of active ingredients), § 333.350 (Labeling of acne drug products). The Acne Monograph explicitly allows BPO—Plaintiffs' alleged source of the benzene—to be used as an active ingredient and imposes no requirement for a BPO Products' label to warn consumers about the presence or potential presence of benzene. *See id.* § 333.310(a) (stating that "[BPO], 2.5 to 10 percent" is a permissible active ingredient"); *id.* §§ 333.350(c)(1)(i)–(ii), (c)(4)(i)–(iii) (laying out the required warnings with no mention of benzene). This is a conclusion reached by at least seven other district courts.[5]

[5] *See Williams*, 2024 WL 4213220, at *3 (noting that the Acne Monograph "lists BPO as a permitted active ingredient and does not require manufacturers to warn consumers of benzene, or mention benzene in any capacity on the label"); *Howard*, 2024 WL 4272931, at *6 ("The monograph expressly permits BPO to be an active ingredient in these products (in an amount from 2.5 to 10 percent)."); *Smoter*, 2025 WL 273437, at *2 ("The provided language for labelling topical OTC acne medication does not include warnings about benzene."); *Daugherty*, 2025 WL 2243622, at *8 ("[T]he FDA specifically identifies the warnings that must be provided for acne drugs containing BPO and these provisions impose no requirement to include warnings of benzene or its risks."); *Bodunde*, 2025 WL 1411306, at *11 ("The acne monograph expressly permits BPO to be an active ingredient in these products in an amount from 2.5 to 10 percent."); *Kouyate*, 2025 WL 2773159, at *10 ("[T]he Acne Monograph does not require [d]efendant to disclose that the BPO Product 'contains benzene.'"); *In re Target Corp.*, 2026 WL 145824, at *10

Plaintiffs argue that their misbranding-based claims are still viable because Defendant violated the general conditions for OTC drug labeling that it was required to follow *in addition* to the labeling requirements specifically laid out in the Acne Monograph. *See* Opp. at 18. To find these general conditions, Plaintiffs direct the Court back to the Acne Monograph, which states:

> An over-the-counter first aid antibiotic drug product in a form suitable for topical administration is generally recognized as safe and effective and is not misbranded if it meets each of the conditions in this subpart *and each of the general conditions established in § 330.1*.

21 C.F.R § 333.101 (emphasis added).

Section 330.1 states that an "OTC drug listed in this subchapter is generally recognized as safe and effective and is not misbranded if it meets each of the conditions contained in this part and each of the conditions contained in any applicable monograph." One condition is that "[t]he product [must be] labeled in compliance with chapter V of the [FDCA] and subchapter C *et seq.* of this chapter, including the formal and content requirements in § 201.66," which govern OTC drug labeling. *Id.* § 330.1(c)(1). From this provision, Plaintiffs identify two sources for their claim that a benzene warning was required to be on the BPO Products' label. First, § 201.66 requires that for all OTC drugs, the "active" and "inactive" ingredients must be on the label. *See id.* §§ 201.66(a), (c)(2), (c)(8). Plaintiffs argue that the BPO Products "contain a harmful and undisclosed component—benzene" that was required to be on the label but was omitted. Opp at 18. Second, Plaintiffs point to subchapter V of the FDCA ("chapter V") which states that "[a] drug . . . shall be deemed to be misbranded . . .[i]f its labeling is false or misleading in any particular." 21 U.S.C. § 352(a)(1); *see also id.* § 331(a). Plaintiffs allege that

---

("The Acne Monograph expressly permits that BPO—in an amount from '2.5 to 10 percent'—may be an active ingredient in OTC topical acne treatment products.").

Defendant's omission of a warning about benzene on the BPO Products' renders them "misbranded" under chapter V. *See* Opp at 6.

Plaintiffs' argument calls for the Court to find that a benzene warning was required for the BPO Products under 21 C.F.R. § 201.66 or chapter V, a finding that would directly contravene the Acne Monograph's explicit labeling requirements, which allow BPO (the purported source of the benzene) as an ingredient and does not require a benzene warning. As laid out in Plaintiffs' SACC, BPO's ability to decompose into benzene has been studied since 1936. *See* SACC ¶ 113. The FDA has investigated the potential safety issues associated with BPO in OTC topical acne drugs since the early 1980s. *See* 75 Fed. Reg. 9767, 9770 (Mar. 4, 2010) ("2010 Final BPO Rule") (providing that in 1982, the FDA "concluded that [BPO], in concentrations of 2.5 to 10 percent, is safe and effective for OTC topical use to treat acne"). Subsequently, the FDA made various rulings regarding the labeling of OTC acne drugs and reviewed research on the safety of BPO. *See* 2010 Final BPO Rule (reviewing the history of the Acne Monograph and the FDA's various undertakings with respect to BPO in part III). As Plaintiffs concede, in 2010, the FDA published the final Acne Monograph, which "conclude[d] that [BPO], in concentrations of 2.5 to 10 percent, is [generally recognized as safe and effective] for the OTC topical treatment of acne. . . based on safety data that we received and evaluated." 2010 Final BPO Rule at 9769; *see also* SACC ¶ 123. At the time of publishing the final Acne Monograph, the FDA's Advisory Committee "unanimously agreed that the word[] 'cancer' should not be included in the labeling of acne drug products containing [BPO]." SACC ¶ 123.

The 2010 Final BPO Rule shows the Acne Monograph was the product of the FDA's decades of research and consideration of public comment. "[W]here the FDA has constructed an elaborate labeling framework [in a monograph] specifying labeling requirements, and [a

particular substance] appear[s] nowhere in that framework, the inference that the agency made a considered judgment about label content is substantially stronger than in cases where the regulatory scheme merely touches on the relevant product category." *Brower v. Colgate-Palmolive Co.*, No. 25 Civ. 3348, 2026 WL 1831253, at *5 (S.D.N.Y. June 25, 2026). The Court rejects Plaintiffs' construction of the general language in 21 C.F.R. § 201.66 and chapter V, finding it incompatible with the FDA's carefully crafted Acne Monograph.

As to 21 C.F.R. § 201.66, the Court joins other courts that have found that "benzene is not an inactive ingredient under federal law," and, therefore, § 201.66(c)(8) does not require its inclusion on the BPO Products' labels.[6] *Navarro*, 2025 WL 3563471, at *13; *see also Kouyate*, 2025 WL 2773159, at *10; *Williams*, 2024 WL 4213220, at *4; *Barnes*, 2023 WL 2456385, at *7. This is because an "inactive ingredient" is defined as "any component other than an active ingredient." *Id.* § 201.66(b)(8). "Component" is not defined in § 201, which relates to labeling requirements, but it is defined in a different portion of the same subchapter related to manufacturing. The definition is as follows: "[C]omponent means any ingredient intended for use in the manufacture of a drug product, including those that may not appear in such drug product." *Id.* § 210.3(b)(3). Plaintiffs do not argue that Defendant in any way "intended" for benzene to be used in "the manufacture of the [BPO Products]." *Id.*; *see, e.g.,* SACC ¶ 61 (alleging "Defendant did nothing to mitigate . . . the harms presented by benzene adulteration, as a result of BPO's decomposition"). Because benzene is not an inactive ingredient, § 201.66(c)(8) does not require it to be on the BPO Products' label. *See Truss v. Bayer Healthcare Pharms. Inc.*, 21 Civ. 9845, 2022 WL 16951538, at *4 (S.D.N.Y. Nov. 15, 2022)

[6] Plaintiffs do not allege benzene is an "active ingredient" under 21 C.F.R. §§ 201.66(b)(2), (c)(2).

(finding that because the production of benzophenone was not alleged by plaintiffs to be an intended ingredient, it was not an "inactive ingredient" under § 201.66).

As to chapter V, the Court recognizes some disagreement among courts on whether it plausibly provides a basis for Plaintiffs to allege that the BPO Products are misbranded because they do not provide a warning about the presence of benzene. *Compare In re Target Corp.*, 2026 WL 145824, at *10, *with Howard*, 2024 WL 4272931, at *8. As an initial matter, "most courts to have addressed [the labeling requirements for BPO products] stop with the monograph," finding that they contain no requirement to disclose the potential presence of benzene, and therefore do not address the chapter V question. *In re Target Corp.*, 2026 WL 145824, at *10. Of the courts that address chapter V, the Court concurs with those that have rejected plaintiffs' attempts to use its language to create additional labeling requirements. *See Kouyate*, 2026 WL 591874, at *8; *Howard*, 2024 WL 4272931, at *9. In particular, the Court agrees that "[c]hapter V of the FDCA provides a set of background requirements that prohibit drugmakers, whose products otherwise comply with the monograph, from making misleading statements that the monograph does not expressly ban." *Howard*, 2024 WL 4272931, at *8 (internal quotation marks and citation omitted). Said differently, the FDA in crafting a monograph cannot contemplate or generate a list of all potential misleading statements by a manufacturer. Chapter V serves as an important bulwark against drugmakers misleading the public about their drugs. For example, a drugmaker who falsely states on their BPO product's label that it "cured male pattern baldness" would violate chapter V's prohibition against making "false or misleading" claims. However, chapter V does not provide support for Plaintiffs' theory that chapter V can be read to affirmatively obligate a drug manufacture to make *additional* warnings on a product that the FDA has not explicitly required in a monograph.

Plaintiffs also direct the Court to the Second Circuit's recent opinion in *Rutledge v. Walgreen Co*., 182 F.4th 168 (2d Cir. 2026). *See* ECF No. 76. Plaintiffs state that "the Second Circuit made clear that although a monograph may require manufacturers to display a particular warning, '[i]t does not prohibit manufacturers from adding *supplemental* warnings when additional . . . risks become known.'" ECF No. 76 at 2 (emphasis in original) (quoting *Rutledge*, 182 F.4th at 202). Plaintiffs then claim that "[t]his is the same argument made in Plaintiffs' brief . . . [that] [n]othing in the [A]cne [M]onograph prohibited or limited BPO manufacturers, such as [D]efendant, from adding additional truthful warnings to the BPO label." *Id*. at 1–2. But Plaintiffs' actual contention, as they reveal in their following sentence, is that "[D]efendant was *required* to disclose the presence of benzene in its BPO products' labeling." *Id*. at 2 (emphasis added). The Court agrees that Defendant was *permitted* to add additional, accurate information to its BPO Products' labels that comported with the Acne Monograph, but that does not bear on the question of whether Defendant was *required* to add a benzene warning and, by not doing so, was in violation of chapter V.

Plaintiffs also cite another recent Second Circuit opinion, *Yousefzadeh v. Johnson & Johnson Consumer Inc.*, as a supplemental authority. *See* ECF No. 77. Plaintiffs rely on dictum stating that "presumably . . . a monograph drug could be considered misbranded if it has a dangerous effect on the user, even when the drug's label conforms to the monograph requirements." *Yousefzadeh*, 184 F.4th at 149. The Court's denial of Plaintiffs' misbranding claim is consonant with the Second Circuit's reasoning. It is possible to imagine that if a manufacturer put cyanide or some other toxic substance in its BPO product, the drug could be considered misbranded, even if it otherwise conformed to the Acne Monograph. This is not that case. Here, benzene, the substance Plaintiffs allege "has a dangerous effect on the user," is

derived from BPO which the Acne Monograph *explicitly* approves of as an ingredient after decades of consideration.[7]

In summary, the Court finds that Defendant complied with its federal labeling requirements for the BPO Products and did not violate the FDCA by omitting a benzene warning from the BPO Products' labels. As such, any state law that Plaintiffs contend Defendant violated by not including a benzene warning "impos[es] a labeling requirement that is 'different from' or 'in addition to' those provided by the FDCA." *Critcher*, 959 F.3d at 36. Plaintiffs' state law claims asserting Defendant misbranded its BPO Products are, therefore, preempted.

B. BPO Products Adulteration Claim

Plaintiffs, in support of their state law causes of action, also argue that the presence of benzene renders the BPO Products "adulterated" under the FDCA. *See, e.g.*, SACC ¶¶ 72, 84, 86. Plaintiffs contend that there is a "federal cap on the level of benzene in acne products," which Defendant violated in its "manufacturing or holding process." Opp at 5; SACC ¶ 56. Plaintiffs claim that cap is 2 parts per million ("ppm"). *See, e.g.*, SACC ¶ 40. Plaintiffs then argue that because the BPO Products contained over 2 ppm of benzene, Defendant violated chapter V, which states that a drug is "adulterated" if "it consists in whole or in part of any filthy, putrid, or decomposed substance . . . [or if] the methods used in, or the facilities or controls used for, [the drug's] manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with [cGMP]." 21 U.S.C § 351(a)(1). Essentially, Plaintiffs contend that the presence of benzene at 2 ppm in the BPO Products violates chapter V because benzene is a "filthy, putrid, or decomposed substance" and, separately, because

[7] The Court further notes that the FDCA's explicit labeling preemption provision does not apply to product liability claims. *See* 21 U.S.C. § 379s(c). Therefore, a potential plaintiff who suffered a "dangerous effect" from an acne drug would be able to bring state law product liability claims without concern of preemption.

benzene's presence at such elevated levels supports Plaintiffs' allegation that Defendant violated its required manufacturing standards as laid out in the cGMPs.

The Court concludes that Plaintiffs "are unable to identify any provision of the FDCA or any FDA regulation prohibiting benzene in excess of 2 ppm in BPO-based acne medications." *O'Dea*, 779 F. Supp. 3d at 1146; *see also Kouyate*, 2025 WL 2773159, at *16 ("Plaintiff cites only non-binding FDA guidance that does not stand for the proposition that an acne product is adulterated because it contains greater than 2 ppm of benzene."). Without identifying a source for the 2 ppm benzene cap, Plaintiffs cannot successfully argue that the BPO Products are adulterated.

The Court now reviews the three sources from which Plaintiffs try, and fail, to derive a 2 ppm federal benzene cap. Crucially, Plaintiffs do not, nor could they, point to the Acne Monograph as the source of the federal cap. This is because, as previously discussed, the Acne Monograph specifically allows manufacturers to use BPO and is silent as to any prohibition on benzene. First, Plaintiffs point to the FDA March 2025 Notice, which announces the voluntary recall in which the FDA "recalled Defendant's acne product due to 'elevated levels of benzene.'" FDA March 2025 Notice at 1. Plaintiffs argue that "[i]f there were no federal cap on the level of benzene that can be contained in drug products, the FDA would not have issued the recall in the first place." Opp. at 5. As an initial matter, "a voluntary recall alone does not establish a violation of federal requirements." *Wieder v. Advanced Bionics LLC*, No. 24 Civ. 8495, 2026 WL 880370, at *3 (S.D.N.Y. Mar. 31, 2026). Moreover, the FDA March 2025 Notice does not state that the recalled products were adulterated. *See* FDA March 2025 Notice. It advises the public that the recall "does not specifically instruct consumers to take actions regarding products currently in their possession" and that "[e]ven with daily use of these products for decades, the

risk of a person developing cancer because of exposure to benzene found in these products is very low." *Id*. at 1. There is no mention of federal regulations, let alone a violation of federal regulations. *Id.* at 1–3. Plaintiffs do not allege that the FDA issued a mandatory recall or that there have been other subsequent voluntary recalls involving Defendant's BPO Products. The one-off voluntary recall of a single lot of one of Defendant's BPO Products does not give rise to a reasonable inference that a benzene prohibition exists and that Defendant violated federal regulations in the manufacturing of the BPO Products.

Plaintiffs then point to various "FDA guidance" and "warning letters" to support their claim that federal regulations prohibit benzene in the BPO Products. *See* Opp. at 6–8. Plaintiffs attempt to cobble together a regulatory prohibition on benzene from what they concede are "non-binding" regulatory guidance and letters. *Id*. at 8. Defendant correctly points out that the "FDA creates OTC drug rules after public comment in the Federal Register, not by sending out alerts about voluntary recalls, warning letters, or other non-binding guidance documents." Reply at 6; *see also Jordan v. CVS Pharmacy, Inc*., No. 23 Civ. 00979, 2024 WL 3258317, at *1 n.3 (W.D.N.Y. May 8, 2024) ("FDA warning letters do not constitute agency decisionmaking or enforcement actions."); *Holistic Candlers & Consumers Ass'n v. Food & Drug Admin.*, 664 F.3d 940, 943–44 (D.C. Cir. 2012) (explaining that FDA warning letters do not determine a regulated parties' rights and obligations). Plaintiffs cite the FDA's 2018 Q3C Guidance as one possible source for the 2 ppm benzene cap. *See e.g.*, SACC ¶¶ 27, 73. But the first page of the Q3C Guidance states that it "[c]ontains [n]onbinding [r]ecommendations" and "does not establish any rights for any person and is not binding on FDA or the public." Q3C Guidance, ECF No. 68-5; *see also Kouyate*, 2025 WL 2773159, at *16 (concluding the Q3C Guidance does not provide a federal cap on the sale of acne products with over 2 ppm of benzene).

Plaintiffs also cite to the December 2023 FDA Notice which "alerts drug manufactures to the risk of benzene contamination in certain drugs." December 2023 FDA Notice, ECF No. 71-1; *see* SACC ¶¶ 37–39. As other courts have observed, the notice "does not establish a federal prohibition on the sale of [] products with benzene concentrations above 2 ppm." *O'Dea*, 779 F. Supp. 3d at 1147–48. At most, the December 2023 FDA Notice reminds manufacturers of BPO, "aerosol drug," and "hand sanitizer" products of their duty to "establish scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug products conform to appropriate quality specifications." December 2023 FDA Notice at 1. With regard to the purported 2 ppm benzene cap, the December 2023 FDA Notice refers back to the Q3C Guidance which, as explained, is non-binding. *See id.* at 1–2.

Plaintiffs make one more attempt to establish a 2 ppm benzene limit by pointing to the United States Pharmacopeia ("USP"), which "establishes professional standards for the identity, strength, quality, and purity of drugs." *United States v. McKesson Corp.*, No. 12 Civ. 6440, 2019 WL 438357, at *3 (E.D.N.Y. Feb. 4, 2019); *see* SACC ¶ 43 (stating that the FDCA "expressly recognizes the USP's quality standards for medicines and finds that failure to abide by the USP would render a drug adulterated"). The pathway from the FDCA to the USP standards is found at 21 U.S.C § 351(b), which states that a drug is adulterated "[i]f it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium." Plaintiffs then claim that "[u]nder USP General Chapter 467, benzene is limited to 2 ppm in pharmaceuticals." SACC ¶ 43.

The problem is that the USP General Chapter 467 limit applies to benzene when used as a "Residual Solvent." USP Chapter 467 at 1, ECF No. 68-4. Chapter 467 defines residual solvents in pharmaceuticals "as organic volatile chemicals that are used or produced in the manufacture of drug substances or excipients, or in the preparation of drug products" and that "are not completely removed by practical manufacturing techniques." *Id*. Plaintiffs state that because they "allege that benzene is produced during the manufacture of BPO products, [their] reliance on the USP limitation of benzene to 2 ppm is valid," Opp. at 10 (emphasis removed), and refer to a line from SACC ¶ 54 where Plaintiffs claim that "[t]he benzene radicals then produce benzene." *Id*. Examining the entire paragraph from Plaintiffs' SACC reveals a different story, however:

> Benzene is created in Defendant's [p]roducts, because BPO has a known, inherent propensity to thermally decompose into two molecules of benzoic acid radicals that further decompose to benzene radicals with liberation of carbon dioxide. The benzene radicals then produce benzene.

SACC ¶ 54. Plaintiffs' allegation as stated in the SACC is that BPO, through a multi-step process, "decompose[s]" into benzene. In Plaintiffs' words, benzene is not directly "produced" in the manufacturing process and, therefore, does not fall under USP Chapter 467's definition of a residual solvent.

Lastly, the Court makes a final observation on the repeated use of the word "should" throughout USP Chapter 467, which causes its statements to be read as recommendations not binding requirements. *See, e.g.*, USP Chapter 467 at 1 ("Drug products *should* contain no higher levels of residual solvents than can be supported by safety data." (emphasis added)); *id.* ("Solvents that are known to cause unacceptable toxicities (Class 1, Table 1) *should* be avoided in the production of drug substances, excipients, or drug products unless their use can be strongly justified in a risk-benefit assessment." (emphasis added)); *see also United States v. Maria*, 186

F.3d 65, 70 (2d Cir. 1999) ("[T]he common meaning of 'should' suggests or recommends a course of action, while the ordinary understanding of 'shall' describes a course of action that is mandatory."). Even if benzene somehow met USP Chapter 467's definition of a "residual solvent," the Court would find that USP Chapter 467, like the other sources Plaintiffs cite for its 2 ppm benzene limit, is non-binding guidance.

The Court concludes that there exists no federal prohibition against the BPO Products containing 2 ppm of benzene. Without such prohibition, Plaintiffs cannot claim Defendant's BPO Products were "adulterated" under the FDCA, so they seek to impose a state law safety standard that is "in addition to, or that is otherwise not identical with, a requirement under [the FDCA]." 21 U.S.C. § 379r(a). Plaintiffs' state-law claims based on adulteration are, therefore, preempted.

IV. Dismissal With Prejudice

Plaintiffs' request for leave to amend the SACC is denied. *See* Opp. at 22–24. Plaintiffs have already amended their complaint once, and despite being presented with an opportunity to further amend their pleading after a round of pre-motion letters in connection with this motion, they declined to do so. *See* ECF Nos. 60, 65, 70; *see San Leandro Emergency Medical Grp. Profit Sharing Plan v. Phillip Morris Co., Inc.,* 75 F.3d 801, 815 (2d Cir.1996) (denying leave to replead where "the District Court had already granted plaintiffs the right to amend their complaint once"); Rule III(B)(iv), Individual Practices in Civil Cases ("Non-moving parties are on notice that declining to amend their pleadings to timely respond to a fully briefed argument in the motion to dismiss may well constitute a waiver of their right to use the amendment process to cure any defects that have been made apparent by the briefing."). Further, not only do Plaintiffs fail to offer any idea of how they would amend their complaint, *see Noto v. 22nd Century Grp.,*

*Inc.*, 35 F.4th 95, 107 (2d Cir. 2022), but the Court has concluded that Plaintiffs claims are preempted by the FDCA, a defect which Plaintiffs cannot cure. "[D]ismissal with prejudice is appropriate when 'the flaws in pleading are incurable.'" *Kling v. World Health Org.*, 532 F. Supp. 3d 141, 154 (S.D.N.Y. 2021) (quoting *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 233 (S.D.N.Y. 2009)); *see also McCracken v. Verisma Sys., Inc.*, 91 F.4th 600, 609 (2d Cir. 2024) ("[M]otions to amend should generally be denied in instances of futility . . . ." (quoting *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008)).

Finally, there is a Case Management Plan and Scheduling Order in this case, providing that after August 8, 2025, "amended pleadings may not be filed and additional defendants may not be joined except with leave of the Court." ECF No. 44 at 1. Plaintiffs do not argue that good cause warrants granting leave to amend. *See generally* Opp. A district court "does not abuse its discretion in denying leave to amend the pleadings where the moving party has failed to establish good cause, as required by [Federal Rule of Civil Procedure] 16(b), to amend the pleadings after the deadline set in the scheduling order." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 243 (2d Cir. 2007). The Court, therefore, dismisses Plaintiffs' SACC with prejudice.

**CONCLUSION**

For the reasons stated above, Defendant's motion to dismiss Plaintiffs' SACC is GRANTED with prejudice. The Clerk of Court is directed to terminate all pending motions, enter judgment for Defendant.

SO ORDERED.

Dated: September 15, 2026
New York, New York

ANALISA TORRES
United States District Judge